*738 OPINION.
MoRRis:
The question involved in these appeals is: Who composed the various partnerships and what were the respective interests of each? There are a number of partnerships involved, for the most part created by informal, verbal agreements and understandings. The books and records are meager and incomplete, and the evidence is confusing and conflicting. For convenience we shall consider each partnership separately.
The partnership of Miller & Colianni was originally formed in 1916 by a written contract and was.composed of the taxpayers Addison Miller and Joseph Colianni and their younger brothers. The predominating feature of the written agreement was that the Miller and Colianni interests should always be equal. The younger brothers dropped out in 1917 and were paid $4,000 each. In 1917 the partnership, in its income-tax return, set forth the partnership as composed of Addison Miller and Joseph Colianni, 50 per cent each. Up to 1918 the facts seem clear. For the years 1918, 1919, and 1920, the taxpayers claim various changes, both in the partners and percentages of ownership, as set forth in our findings of fact. These changes are flatly denied by the partner Joseph Colianni. In this direct conflict of testimony we must fall back upon the written evidence, documentary and otherwise. The only written instruments in relation to the composition of the partnership are those of December 1, 1919, the time Joseph Colianni withdrew. These seem to bear out the testimony of Joseph Colianni. In the dissolution agreement, the agreement of sale to George Faltico and supplementary agreements, the partners are referred *739 to as Joseph Colianni and Addison Miller, owning equal shares. They are the only partners mentioned and the only ones required to sign the dissolution agreement. The documents were prepared by the lawyer recommended to Colianni by Schiffer, the accountant and bookkeeper of the firm. He probably furnished the lawyer the information and the figures from which to prepare the documents. The alleged partners were there personally or available, but were not in any way considered by any of the parties as necessary parties to the dissolution agreement. It is also significant that the net worth of Joseph Colianni was recited as $51,615.21, which is the exact amount to a penny, as subsequently computed by a written audit of the books prepared by the said Schiffer a month or two later, February 20, 1920, to be exact. This net worth represented one-half of the total net worth. This amount must have been ascertained from some books or source agreeable to all parties. There was no dispute over the amount. The taxpayers attempt to explain away the significance of the written, sworn documents by stating that Colianni was in a hurry to get out and they were in a hurry to get him out. But it appears that the figures were readily obtainable from some source. We do not feel that we should ignore the importance of these documents as relating to the actual situation.
We can not overlook the audits prepared by Schiffer, who acted as bookkeeper and accountant all this time and up to the present time. He prepared an audit for 1918, one for the first six months of 1919, and one for the last six months of 1919. These audits were carried out to the minutest detail. In these audits Addison Miller and Joseph Colianni were recognized as partners until December 1, 1919. Their interests throughout were calculated on a basis of 50 per cent each during this period. Addison Miller attempts to explain these audits as prepared for the purpose of securing credit, but admitted they had not been used for that purpose. A close examination of these audits, however, convinces us that they were made to reflect the actual condition of the firm.
Furthermore, even the taxpayer George Faltico admitted there was a dispute as to his interest. He said:
Q. Now, then this first paragraph, “ Heretofore Colianni and Miller have been equal partners under the firm name of Miller and Colianni ”■ — When you signed that agreement did you think that was true?
A. If you would let me tell you in my own way I would like to tell you something about that, if I may have your permission.
Q. You may start out, anyway.
A. There was always a little bit of doubt in Colianni’s mind whether I was a partner in this business, or whether I was employed by Colianni. He said that I was employed by him and I said I was a partner of his.
Q. Yes, go on.
*740 A. That was in the fall of 1918 after I returned from the west.
In 1919 after I also returned from a trip to the west Oolianni wanted to enter a brother of his as a partner in this business and he made the statement to me at that time that he wanted to pay me off or discharge me, which I refused to do, as I claimed I was an equal partner in that business and was not employed by Colianni.
Q. Is that all you have to say.
A. Yes, on that.
The status of George Faltico was finally determined by the dissolution agreement and the sale of Colianni’s interest to Faltico, in which he was not recognized as a partner, but, on the contrary, signed a document which expressly stated that the partnership was composed equally by Addison Miller and Joseph Colianni. The requisites necessary to create a partnership do not require discussion here. Suffice it to say, however, it is one essential that there be agreement among all the parties of a partnership as to the members of the partnership.
It is true the partnership filed tax returns showing the interests of partners substantially as claimed herein, and also that the individual returns conformed substantially to the partnership returns. But these are the returns that the Commissioner disputes. There is also a discrepancy between the percentages of ownership in the returns and those claimed at the hearing, which would indicate that any such purported arrangement was vague and uncertain in the minds of the alleged partners. Up to December 1, 1919, therefore, there is a clear preponderance of evidence to sustain the contention of the Commissioner as to the composition of the partnership.
For the balance of the year 1919 and the year 1920 the evidence supports the taxpayers’ contention. The parties testified that there was an oral arrangement that the partnership should be continued as “Addison Miller ” and that the interests of the partners were as claimed herein. There is no written or oral evidence to dispute this point as to the year 1920. Joseph Colianni, during this period, was away and not connected with the partnership. We must hold that from December 1, 1919, to December 31, 1920, the partnership was composed of Addison Miller, 37½ per cent; A. T. Miller, 37½ per cent; George Faltico, 12½ per cent, and P. M. Faltico, 12½ per cent.
The partnership of W. A. Miller & Sons, boarding house business, involves the taxpayer Addison Miller and W. A. Miller. All arrangements and agreements were oral and informal. There were strong indications that Addison Miller practically ran this business, particularly after July 1, 1918, when the boarding house contract *741 with the Northern Pacific Railway was changed to and signed by Addison Miller, and all payments were made to him, but the taxpayer Addison Miller testified positively that there was a family arrangement between him and his father and that he merely drew a salary for his work. The father returned income from this source as his individual income. We are inclined to give the taxpayer the benefit of the doubt and sustain his contention in this regard. Thera was also a dispute as to the method of computing income of this partnership, but our holding does not necessitate consideration of that point. We are of the opinion that the taxpayer Addison Miller had no interest in this partnership during the years in question.
The evidence in regard to W. A. Miller & Sons, labor agency, is vague, both on the part of the Commissioner and the taxpayer. The Commissioner ascribes income to Addison Miller from this source as follows:
1918_$4,857.18
1919_1_ 5,448.29
1920_ 9, 813. 97
It appears that the father, W. A. Miller, ran a labor agency as an individual in connection with thé boarding house business. There was an agency at St. Paul and one at Minneapolis. The taxpayer admits ownership of a labor agency in Minneapolis, but any income from that source was returned as income in his individual return. He denies ownership of the St. Paul agency, as that was his father’s, who returned income from that agency in his individual income-tax return. In the light of the testimony, we are of the opinion that the taxpayer Addison Miller received no income from the W. A. Miller & Sons (labor agency) partnership other than that returned by him.
The income from the Northern Pacific Labor Agency (Faltico Labor Agency) was attributed by the Commissioner to be that of George Faltico during the period January 1, 1918, to June 3, 1919. The evidence on this was conflicting, even among the witnesses of the taxpayer. The taxpayer explains that, during the first part of the year 1918, he was a Federal labor agent and had turned this business over to his brothers, P. M. Faltico and M. J. Faltico, and that from July 17, 1918, he was with the firm of Miller & Colianni and was for the most part at Seattle, Wash. However, the evidence discloses that during this time the bank account of this partnership was left in the name of George Faltico, and that substantial deposits from the agency were made throughout the year 1918, amounting to $16,214.98, and that during the year 1919 to June 3, 1919, the average monthly balance was $500. On June 3, 1919, the account was *742 changed from the name of the taxpayer to that of his brother, P. M. Faltico. At the hearing P. M. Faltico testified on direct examination:
Q. Were you interested in tlie labor agency in Minneapolis known as the Faltico Labor Agency, or some other such name?
A. When was that?
Q. 1918.
A. No, sir.
Q. 1919?
A. No, sir.
Q. Did your brother George Faltico turn any labor agency over to you in Minneapolis?
A. Not to me, he did not.
Q. And you had no interest in it?
A. No interest whatsoever in the labor business.
Q. And your brother M. J. had an interest in it?
A. M. J. Faltico in 1919, I think it was.
Q. 1919?
A. Yes, 1919.
On cross examination he testified:
Q. Were you eomiected with this labor agency at 7th and Marquette Avenue at any time?
A. In 1923 I ran it.
Q. In 1918, 1919 and 1920?
A. I had nothing to do with it.
Q. You had nothing to do with it at all?
A. No.
Q. Why did you deposit in it in the name of George Faltico, then?
A. Just looking after his interests while he was away.
Q. Did you deposit any moneys in that bank during 1919, or if you did, it was for George Faltico, wasn’t it?
A. M. J. Faltico.
Q. And also George?
A. No.
Q. You don’t remember ever having a bank account in your name in that bank?
A. No.
Q. During any of these years?
A. No sir.
The taxpayer’s testimony was that P. M. Faltico ran the business during this period, but this brother testified he was merely looking after it for the taxpayer.
It seems clear to us that the brothers were running this business for George Faltico in his absence. We therefore find that during the period January 1, 1918, to June 3, 1919, the taxpayer George Faltico was the owner of this business and the income derived therefrom should be computed accordingly.
On reference to the Board, Smith did not participate.